## EMLENTON REFINING CO. v. CHAMBERS.

Circuit Court of Appeals, Third Circuit.
October 7, 1929.

No. 3939.

Buffington, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Frederic P. Schoonmaker, Judge.

Action by Walter A. Chambers against the Emlenton Refining Company. Judg-

ment for plaintiff, and defendant appeals. Affirmed.

John E. Mullin, of Kane, Pa., Gunnison, Fish, Gifford & Chapin, of Erie, Pa., Mullin & Woods, of Kane, Pa., and Frampton & Courtney, of Oil City, Pa., for appellant.

Bigham, Englar & Jones, of New York City, Edmund C. Breene, of Oil City, Pa., and Acker, Manning & Brown, of Philadelphia, Pa. (J. Thruston Manning, Jr., of Philadelphia, Pa., of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. Walter A. Chambers, a citizen of the State of New York, trading as G. L. P. Chambers & Company, was engaged as a commission merchant in buying and selling petroleum and its products for others. James M. Adams, a citizen of New Jersey, trading as Adams & Thomson, was engaged in the business of buying and selling petroleum and its products for himself. Chambers and Adams had business dealings, the outcome of which was that, early in 1915, one or the other made three contracts with Emlenton Refining Company, a Pennsylvania corporation engaged in refining and selling petroleum and its products, whereby either Chambers or Adams agreed to purchase and the Emlenton Company agreed to sell and deliver f. o. b. in New York City:

(a) Ten carloads, 30,000 pounds each, of white crude scale wax at an agreed price and for stated deliveries;

(b) Seventy carloads of the same product of equal weight at the same price for other deliveries; and

(c) Seventeen carloads of the same product of the same weight at the same price for still other deliveries.

The contracts were partly in writing and partly oral, the written portion consisting of telegrams and letters passing between the parties.

It would seem on first view that Emlenton breached the contracts in these respects: Though under the first contract it delivered all ten cars, their weights were less than those agreed upon; under the second it delivered but eleven of the seventy cars with under-weights; and in the third it delivered but thirteen of the seventeen cars.

Chambers, having conducted the negotiations and made the contracts with Emlenton (as he thought) in his own name yet for the benefit of Adams, the ultimate recipient of the wax, in 1917 brought suit (called throughout this protracted litigation the "first suit"), abbreviating names for convenience, thus: Chambers, for the use of Adams, v. Emlenton, averring that the contract was made by him as principal but for the use of Adams. This suit came to trial and for reasons not presently pertinent the plaintiff suffered a voluntary nonsuit. Adhering to the numerals used by counsel, a "second" suit was brought in 1919, this time by Adams v. Emlenton, averring that the contracts were made by him as principal through Chambers his agent. This suit went to pleading and eventually to trial; the defendant challenging Chambers' agency and alleging the contracts were made with Chambers as principal, not with Adams the plaintiff. As the verdict was for the defendant the jury may or may not have resolved that issue for the defendant. This will be discussed further. Pending the second suit there was started a "third suit," in title and substance like that of the first, being, Chambers, to the use of Adams, v. Emlenton, and averring that the contracts were made by Chambers, as the defendant itself had contended and therefore admitted in the second suit and on that contention seemingly had won. In the third suit for $82,926.21 damages, which has ripened into a judgment for $48,544.45 in favor of the plaintiff now here on review, the defendant, by matters properly pleaded, interposed the defenses of res judicata, equitable estoppel and judicial estoppel, both as to the legal plaintiff and use-plaintiff by reason of their conduct and testimony in the prior suits and by reason of the judgment in its favor in the second suit; thus raising equitable defenses which were heard by the learned trial judge preliminary to the trial and by him decided and put into judgment prematurely, we intimated, when the case was here on review, 14 F.(2d) 104, which judgment the learned judge later opened but held to his decisions against the defendant on these defenses. They are matters now embraced in the final judgment and properly here for review on appeal not prematurely taken.

While the case is susceptible of division, as the defendant has divided it, into two main parts: (1) That having to do with alleged error in the proceedings in advance of the trial on the merits; and (2) that having to do with the proceedings during the trial, the outstanding question, after all, is whether the judgment for the defendant in the second suit by Adams v. Emlen-

ton is res judicata of this case of Chambers, to the use of Adams, v. Emlenton.

In reviewing this and other questions we are moved by the tenor of the oral argument rather than by the briefs to note that we shall not re-try this case on the merits or concern ourselves with conceived errors of the jury when acting on sustaining evidence but shall limit our discussion and decision to alleged errors of law committed by the trial judge.

There is no possible doubt that Emlenton made three contracts with either Chambers, for the use of Adams, or with Adams himself for future deliveries of wax in large quantities, and there is no doubt that there was evidence enough to sustain the jury's finding that on a rising market Emlenton breached these contracts and enough evidence to sustain its verdict for damages, provided the suits were properly brought and maintained, the evidence properly admitted and the case properly submitted. This proviso has been prompted by the confusion in which the contracts were negotiated and the utter confusion in which during war time they were in part performed and in part repudiated, producing a situation where, in our view, it is impossible to reconcile all the actions and correspondence of the parties precisely with their respective contentions and where it was absolutely impossible to decide the controversy involving very real rights of both parties except by trial and decision by a fact finding tribunal such as arbitrators or a jury. The parties resorted to a jury; and so by its verdict they must abide if the case was properly maintained and submitted.

██ Whether the judgment for the defendant in the second suit (Adams v. Emlenton) is res judicata of the third (Chambers, to the use of Adams, v. Emlenton) depends upon the character of the two suits, what was the cause of action in the third, and, accordingly, what was the cause of action and what was decided in the second. The first suit is out of the question for by taking a nonsuit, as he had a right to do, the legal plaintiff prejudiced no rights of the equitable plaintiff or of his own. If the two suits (second and third) were between the same parties on the same cause of action, the judgment in the second would of course be res judicata of the third. Admittedly the basic subject-matter of both suits was wax. But the causes of action in the two suits were not wax but contracts for wax, and the identity of contracts in the two suits depends upon the identity of con-

tracting parties. In the second suit (Adams v. Emlenton) the plaintiff said the party was Adams, having negotiated through Chambers as an agent; the defendant by formal pleadings denied that it contracted with Adams as principal and denied that Chambers was Adams' agent, and averred that it had no contract relations with any other person than Chambers, realizing quite clearly that if it prevailed in this contention Adams could not prove the contract he had declared on and would fail. So when the case came to trial this question at once stood out in front and the learned trial judge, realizing its controlling importance, instructed the jury that: "The first question at the foundation of this case is the question of agency, which you will naturally dispose of first." Then, after discussing the law and the facts, the learned judge continued: "You will endeavor to give to every relevant fact, * * * disclosed by the evidence its proper weight as bearing on the existence or nonexistence of the agency of G. L. P. Chambers & Company. If you find under the evidence that no such agency, whether disclosed or undisclosed existed, then you will go no further and defendant would be entitled to your verdict. * * * If you find the question of agency in favor of the plaintiff, you will then proceed to consider the contracts themselves."

If there were nothing more in the case than the verdict for the defendant which followed, it might be difficult or impossible to determine whether the jury found with the defendant that Chambers was not an agent for Adams but was himself the principal with whom it contracted. The pleadings, however, throw light on the jury's deliberations and verdict. By paragraphs 17 to 22 inclusive of the statement of claim, the plaintiff declared on contract No. 17017 for seventeen carloads of wax and, admitting delivery of thirteen cars, sought to recover for four cars not delivered. The defendant by its affidavit of defense set up an alleged failure of the plaintiff to furnish shipping instructions with respect to these cars and maintained that by reason thereof the unshipped balance of the contract became automatically cancelled and abandoned. Subsequently the defendant amended its affidavit of defense, abandoning its defense of lack of shipping instructions, and alleged a total shipment of thirteen cars under this contract containing a total weight of wax exceeding the total of what would have been contained in seven-

teen cars of 30,000 pounds each, thereby claiming in the affidavit and on trial that this constituted fulfillment of the contract. It should be noted that this amendment left as defendant's only defenses to the plaintiff's claim on this (the second) contract, first, a denial that Adams was the proper party plaintiff; second, complete fulfillment of the contract by the shipment of thirteen cars with excess weight. Thus the defense of lack of shipping instructions fell out of the case. Nor can it be very seriously argued that the defense in respect to shipping instructions was left open and passed upon by the jury in view of the change in the pleadings and the fact that there was evidence that the appellant had actually received sufficient shipping instructions and later had admitted in writing its obligation to deliver the wax. Moreover, the court correctly instructed the jury that if they "find from the weight of the material and credible evidence that the plaintiff (Adams) was the real purchaser of the wax, then the contract of April 6, 1915, the defendant's order No. 17017, being for seventeen cars, and under the evidence in the case only thirteen cars being shipped and applied on said contract, the defendant under the contract and evidence, has no right to apply any alleged overweight in said cars shipped against the four cars undelivered thereunder, and the verdict of the jury should be for the plaintiff for the four cars of wax undelivered under this contract."

Under this instruction if the jury had found Adams was the purchaser they would have been bound to return a verdict for him for the four cars of wax, which is not what they did. Thus the issue on this contract became restricted to that raised by the defendant as to whether Adams or Chambers was the party with whom it had contracted and therefore whether Adams was the proper party plaintiff. In these circumstances the only question unconditionally submitted on this contract was that of agency and as the jury found for the defendant it follows necessarily that they found that it contracted not with Adams but with Chambers as principal. By that finding Chambers was left free to act, so he prosecuted the third suit—the suit at bar —in his name as principal to the use of Adams, in consonance with the defendant's contention and the theory of the judgment in the second suit. His cause of action, though started in the first suit, had never been prosecuted to judgment; his right of action was not abridged by Adams' defeat. Unless we ignore the distinction between a legal plaintiff and a use-plaintiff—the distinction between a legal plaintiff in whom the cause of action is vested and an equitable plaintiff who, though without legal rights in the cause of action, is in equity entitled to the thing sued for— there was not, on the defendant's contention and the jury's showing in the second suit, identity of parties and identity of causes of action in the two suits and in consequence the judgment rendered in the second suit was not res judicata of the third case. Cromwell v. County of Sac, 94 U. S. 351, 24 L. Ed. 195; Lyon v. Perin & G. Mfg. Co., 125 U. S. 698, 8 S. Ct. 1024, 31 L. Ed. 839.

The trial court committed no error in dismissing this equitable defense as made by the record and no error in refusing the defendant's attempt to contradict the record by the testimony of jurors.

■ The next equitable defenses disposed of by the court adversely to the defendant preliminary to trial are that both the legal plaintiff and use plaintiff are precluded by equitable estoppel and judicial estoppel from maintaining the instant action. These defenses of estoppel are based on the uncertain conduct of Chambers and Adams in instituting and prosecuting successive litigation in different names thereby causing the defendant considerable expense and very great annoyance, and with respect to that of judicial estoppel based also on the inconsistent positions taken by Chambers and Adams in the series of suits and their inconsistent statements made and sworn to in the progress of the litigation. These defenses are, after all, based upon or linked up with the whole story of the controversy which we shall not attempt to state even in outline. It will be enough to say, keeping in mind the essential elements of equitable estoppel (sufficiently stated in 21 Corpus Juris 1202–1231) and keeping in mind also the distinction between equitable estoppel and judicial estoppel, that we have read the record and are constrained to find that it is lacking in several of the essential characteristics of these doctrines, in whose absence, of course, we find that the learned trial judge properly refused to apply the doctrines.

■■ Coming to errors which the defendant alleges were committed at the trial, the first assigned was the court's refusal to submit to the jury the defense of res judicata as a legal defense. As the defendant plead-

ed this defense as an equitable defense in its affidavit and demanded that the court dispose of it prior to trial conformably with the rule in that regard, Emlenton v. Chambers (C. C. A.) 14 F.(2d) 104, 106, and as the court did so, the defendant was not entitled to have the jury re-try the question and perhaps reverse the judgment of the court which had been invoked and properly exercised. But aside from this technical aspect of the contention we find that, if for no other reason, the defense of res judicata should not have been submitted to the jury as a legal defense, because the facts would not have sustained a finding by the jury in the defendant's favor.

Next, the defendant maintains that the alleged contracts sued on were not valid, legal or binding obligations although the defendant made part performance of each contract by making deliveries and accepting payments. It explains its conduct in this respect by regarding the transactions looking forward to future deliveries as merely preliminary to the giving of "orders," which when given grew into contracts and were performed in the manner indicated. The doings of the parties leading up to or entering into contracts or orders were submitted to and passed upon by the jury who later found that contracts existed and had been breached with resultant damages which, though substantial, were only about one-half of what the plaintiff claimed.

█ There arose a controversy during the trial as to the meaning of the words f. o. b. New York contained in each contract. The defendant by a point which the court refused asked that the jury be instructed that if they should find from the course of dealing between the parties that wax was ordered and shipped to Philadelphia although priced as f. o. b. New York and on such shipments the difference between the rate of freight from Indiana to New York and to Philadelphia was, on demand of Chambers, credited and allowed by defendant, the jury would then be justified in finding (as a construction of the contract) "that by use of the expression f. o. b. New York in the orders it was the intention of the parties to merely fix the price beyond which no charge could be made by the shipper or carrier *and did not require delivery of the wax at New York by the defendant as a consummation of the contract.*" As nondelivery to New York was a substantial element of the alleged breach of the contracts, the question became important. The court admitted all evidence having a bearing on the point and charged the jury that inasmuch as, admittedly, the contracts were otherwise silent on the point of delivery there was a presumption that the expression fixed the place of delivery, but that if the parties by their actions and correspondence had placed a construction upon this expression the jury should find accordingly and left it with them to say whether or not the expression related to price only or to delivery. We see no infirmity in the submission of that question and as the jury has decided it on evidence which, if believed, sustains their finding, the parties are concluded by the verdict.

The contracts calling for delivery of wax f. o. b. New York were silent as to shipping instructions. The defendant contended that shipping instructions were a pre-requisite to shipment of wax and failure of the plaintiff to furnish such instructions relieved it of any obligation to make shipment. While we find that the court did not commit error in refusing to charge the defendant's requests in that regard or in leaving the whole matter to the jury, there was, however, evidence that the plaintiff did give shipping instructions which, doubtless, the jury, even in the confusion of counsels' statements on the subject, considered and disposed of.

█ In December 1915 and during the year 1916 certain embargoes were placed by the terminal carriers going into New York which made it impossible to ship wax to New York for export except under permits issued by the railroads upon satisfactory assurance that steamer space would be available to take the freight and thereby the cars would be unloaded promptly. Though the plaintiff could of course sell and ship its wax when received just as it chose, there was nothing in the contract showing that the wax was purchased for export—nothing beyond delivery f. o. b. New York. The defendant at the trial took the position that shipping permits made necessary by the railroad embargoes on shipments to the Port of New York were required to be furnished by the plaintiff and his failure to furnish them relieved it of any obligation to make shipments covered by those embargoes. While, seemingly, the risk of embargo was that of the defendant, which had engaged unconditionally to make deliveries in New York, the court refused to instruct the jury that this constituted a defense but did instruct them that the defense under the embargoes is only available to the defendant to the extent to which it

satisfied the jury by the preponderance of evidence that it had wax actually available for shipment during such period and was ready and willing to deliver and either made a lawful tender thereof to the plaintiff or that such tender was waived. We think that instruction, while a little hard on the plaintiff, was not prejudicial to the defendant—though perhaps hurtful because of its lack of evidence of tender—and was under the contracts a proper instruction.

The remaining assignments of error are resolved against the defendant without discussion.

The judgment is affirmed.

BUFFINGTON, Circuit Judge (dissenting). I am constrained to record a dissent in this case on the question of res judicata. The general principles of this form of estoppel in the federal courts is stated in City of Boston v. McGovern (C. C. A.) 292 F. 705, 711, as follows: "It should be remembered that the estoppel of a judgment grows out of matter of substance, and form has little if anything, to do with it. Bigelow on Estoppel (6th Ed.) p. 96." In Pennsylvania, where this cause of action arose and was tried, the same principle prevails. In Strayer v. Johnson, 110 Pa. 21, 1 A. 222, 224, it is said: "The term 'parties' is of course well understood as including all directly interested in the subject-matter, who have a right to defend or control the proceedings and appeal (Giltinan v. Strong, 64 Pa. 242); and courts will even look beyond the nominal party, and treat as the real party him whose interests are involved in the issue, and hold him concluded by any judgment that may be rendered. Peterson v. Lothrop [34 Pa. 223], supra." In accord with this, the same court in Hochman v. Mortgage Finance Corp. et al., 289 Pa. 260, 137 A. 252, 253, held: "1. The doctrine of res judicata should be supported, maintained and applied in proper cases and its application should not be restricted by technical requirements, but a broad view should be taken of the subject, having always in mind the actual purpose to be attained. 2. The rule should not be defeated by minor differences of form, parties, or allegations, when they are contrived only to obscure the real purpose—a second trial in the same cause between the same parties. 3. The thing which the court will consider is whether the ultimate and controlling issues have been decided in a prior proceeding in which the parties in the later suit had actually an opportunity to appear and assert their rights. 4. The parties should not, by a shifting of plaintiffs on the record, or by a change in the character of the relief sought, be permitted to nullify the rule. 5. The requirements for application of the rule are that there be an identity of the parties and of subject-matter in the two actions. 6. If the whole cause of action in the second case is the same as in the first, not only the issues actually adjudicated in the first proceeding, but also those which might have been raised and passed upon, are concluded. * * * It is a general principle of public policy, making for the general welfare, for the certainty of individual rights, and for the dignity and respect of judicial proceedings, that the doctrine of res adjudicata should be supported, maintained and applied in proper cases. Nor should its application be restricted by technical requirements, but a broad view should be taken of the subject, having always in mind the actual purpose to be attained. The rule should not be defeated by minor differences of form, parties or allegations, when these are contrived only to obscure the real purpose, a second trial on the same cause between the same parties. * * * "

The same principle is enunciated in Chicago, R. I. & P. R. Co. v. Schendel, 270 U. S. 611, 46 S. Ct. 420, 422, 70 L. Ed. 757, 53 A. L. R. 1265, where it is held that in any judicial proceeding, the arrangement of the parties on the record is of no consequence upon the effect of the judgment so long as the parties are adverse. Identity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different (Bigelow on Estoppel [6th Ed.] 145); and parties nominally different may be, in legal effect, the same (Calhoun's Lessee v. Dunning, 4 Dall. [Pa.] 120, 121, 1 L. Ed. 767, 768; Follansbee v. Walker, 74 Pa. 306, 309; In re Estate of Parks, 166 Iowa, 403, 147 N. W. 850).

Applying these principles to the case in hand, we have:

(1) The fact that before cases 2 and 3 were begun Chambers had on February 6, 1917, absolutely assigned all interest in the contracts to Adams.

(2) Throughout these actions Adams instituted the proceedings, verified the pleadings, and controlled the litigation through the same counsel.

(3) The sole and only parties in interest in both cases were Adams and the Emlenton Refining Company.

(4) While the second and third cases were pending and before the trial of the third case, Adams procured a stay of the proceedings in the third case on the strength of an affidavit by him in which he swore that the third case "involved the same issues and cause of action and is dependent on the same facts as another suit also pending in your Honorable Court," referring to case No. 2.

In this situation Adams prosecuted case No. 2, with the result of a verdict and judgment against him, from which no appeal was taken. This verdict and judgment, the result of a trial covering many weeks and involving an outlay of many thousands of dollars by the Emlenton Refining Company, was held by the court below as of no legal effect whatever when Adams proceeds to try the same cause of action between him as the sole owner of the claim and the Emlenton Refining Company as the sole defendant in this third case, which, as we have seen, he had postponed until he had tried the second case. The holding of the court below, in my judgment, was at variance with the law of Pennsylvania, applicable to two cases where Adams and the Emlenton Refining Company were the sole parties in interest and the contracts involved were the same. I therefore record my dissent.